UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                )
JAMES DOE and JANE DOE,         )
Individually, and as Natural    )
Parents and Next Friends of     )
JOHN DOE,                       )
                                )
          Plaintiffs,           )
                                )
     v.                         )   C.A. No. 23-414 WES
                                )
RHODE ISLAND INTERSCHOLASTIC    )
LEAGUE,                         )
                                )
          Defendant.            )
_____)

## MEMORANDUM AND ORDER

WILLIAM E. SMITH, District Judge.

     Youth in this country are experiencing a mental health
crisis.[1]  The rates of depression and anxiety among teens have
skyrocketed, along with the rates of teens considering and
committing suicide.[2]  Research suggests that these alarming trends

---

[1] The crisis among children and teens has become so severe
that the American Academy of Pediatrics has declared it a national
emergency.  Erica Pandey, The State of the Teen Mental Health
Crisis — and How to Help, Axios (last updated May 14, 2022),
https://www.axios.com/2022/05/10/kids-teen-mental-health-crisis-
parents-teachers-how-to-help.

[2] Erica Pandey, Screens Are Poisoning Kids' Minds, Axios (Mar.
22,   2024),   https://www.axios.com/2024/03/22/screen-time-bad-
unhealthy-kids-mental-
health?utm_source=newsletter&utm_medium=email&utm_campaign=newsl
etter_axiosam&stream=top (identifying studies describing how the
rate of anxiety and depression among teens has increased by more
than 50% from 2010 to 2019; the suicide rate for children between
the ages of 10 and 14 has tripled between 2007 and 2021; and the

stem from the increased use of phones and social media among teens and the declining rates of teens spending time with friends in person.[3]  Though such trends existed in the years leading up to the COVID-19 pandemic,[4] the calamities of the pandemic only served to catalyze them.[5]

Extracurriculars can serve as a remedy to these damaging trends in teen mental health.  One study examined the mental health of students during the COVID-19 pandemic and found a correlation between students' participation in extracurricular activities and lower rates of anxiety, inattention, hyperactivity, and depressive symptoms.[6]  These results reflect previous research finding an

---

rate of high school girls considering suicide increased from 19% in 2011 to 30% in 2021).

[3] Id. (noting a study finding that high school kids on average saw friends in person 3 times a week during the early 2000s, but only 1.5 times a week today); Christine Mehta, Why Today's Youth are 'The Anxious Generation', Bos. Globe (last updated Mar. 24, 2024), https://www.bostonglobe.com/2024/03/24/opinion/jonathan-haidt-the-anxious-generation/?p1=BGSearch_Advanced_Results (similarly noting how teens on average spend only 30-60 minutes a day in person with friends, which is down from two hours before 2010).

[4] Jen Rose Smith, Are the Kids All Right? Supporting Your Teen's Mental Health Through COVID-19, CNN (republished Oct. 8, 2020), https://www.cnn.com/2020/10/08/health/teen-mental-health-pandemic-wellness/index.html (referencing a 2019 study).

[5] See Moriah Balingit, 'A Cry for Help': CDC Warns of a Steep Decline in Teen Mental Health, Wash. Post (Mar. 31, 2022), https://www.washingtonpost.com/education/2022/03/31/student-mental-health-decline-cdc/.

[6] Kaitlyn LaForge-MacKenzie, et al., Participating in Extracurricular Activities and School Sports During the COVID-19 Pandemic: Associations With Child and Youth Mental Health, Front

association between participating in sports and positive post-high school mental health outcomes.[7]  Participation in team sports in particular is associated with overall psychological well-being.[8]

The plaintiff here, John Doe, is like many of his generation. He experienced some of high school on a screen at the height of the pandemic.  His parents, James and Jane Doe, wanted better. After spending a year at a parochial school where there was remote learning, John's parents enrolled him in an out-of-state boarding school – where he would repeat freshman year - with the hope that he would have a better academic experience and forge in-person social connections with other students of his age.  Unfortunately, his experience did not pan out as John's parents had hoped.  While in boarding school, John's academic performance and social and physical health took a steep decline.  That summer, John was diagnosed with anxiety, depression, and Attention- Deficit /

_____

Sports     Act     Living     (Aug.     29,     2022),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9464933/;     Eva
Oberle, et al., <u>Screen Time and Extracurricular Activities as Risk and Protective Factors for Mental Health in Adolescence: A Population-Level Study</u>, Preventative Medicine 3-6 (Dec. 2020).

[7] Rachel Jewett, et al., <u>School Sport Participation During Adolescence and Mental Health in Early Adulthood</u>, J. of Adolescent Health 642-43 (2014).

[8] <u>See generally</u> Narelle Eather, et al., <u>The Impact of Sports Participation on Mental Health and Social Outcomes in Adults: A Systematic Review and the 'Mental Health Through Sport' Conceptual Model</u>, Systematic Reviews (2023) (providing a comprehensive review of studies confirming the association between playing team sports and improved mental health).

Hyperactivity Disorder ("ADHD"), among other learning disabilities. As part of John's treatment, doctors recommended he get involved in sports. After John returned to Rhode Island and enrolled in a private school, he did just that. By all accounts, his time playing competitive football and basketball made a real positive impact on his mental health and overall well-being.

John will be a senior next year and wants to continue playing on his respective teams. The only problem, however, is that the Rhode Island Interscholastic League ("RIIL" or the "League") – the organization that administers competitive sports in the state - has an Eight-Semester Rule (the "Rule"). Under the Rule, a student becomes automatically ineligible to play competitive sports eight semesters from when he enrolls in ninth grade. John will be enrolled in his ninth and tenth semesters of high school next year because he repeated freshman year at the boarding school.

Despite the mental health crisis that has afflicted John and other students in this state and across the country, as well as the universally recognized benefits of participation in high school sports,[9] the League put its foot down and denied John's

---

[9] DXD, RIIL Mission Statement, ECF No. 11-2 ("Athletic competition is a major component [of] education. . . . Research indicates that student-athletes have better grades than non-athletes and that student-athletes have higher attendance rates and higher graduation rates than non-participants.").

request for a waiver of the Rule.  It avers that he is not entitled to a waiver as he did not repeat freshman year <u>because of</u> his learning disabilities.  Rather, it was his parents' personal decision to have John repeat his freshman year.

Instead of having John be fully part of a team, the League wants John to sit on the sidelines, despite the demonstrably profound benefits that extracurriculars, like team sports, have on students' mental health.  The League insists that the Rule applies even though there is no evidence in the record suggesting John's playing would give him or his team an unfair advantage or would pose a risk to other students' safety, or otherwise adversely affect other players or teams in any way.  Their justification?  Well, that's the rule, and rules are rules.[10]

----

[10]    It is curious why competitive high school sports have become such an elevated extracurricular activity.  Had John wanted to participate in art club, marching band, mock trial, debate club, or service club during his ninth and tenth semesters, it is highly doubtful that there would be a challenge to his participation.  Conflicts, like this one, only arise in the context of athletics.  <u>See, e.g.</u>, <u>Doe v. Horne</u>, No. CV-23-00185-TUC-JGZ, 2023 WL 4661831, at *22 (D. Ariz. July 20, 2023) (granting preliminary injunction that would allow two transgender female students to participate in interscholastic sports); <u>D.M. v. Or. Scholastic Activities Ass'n</u>, No. 6:22-cv-01228-MC, 2022 WL 17104604, at *4 (D. Or. Nov. 22, 2022) (denying preliminary injunction in case where students sought waiver of eight-semester rule because of mental disabilities); <u>Jones as next friend of Jimmy v. Mass. Interscholastic Athletic Ass'n</u>, No. 22-CV-11426-AK, 2022 WL 6819608, at *8 (D. Mass. Oct. 1, 2022) (denying preliminary injunction over whether virtual students could participate in athletics at their local brick-and-mortar schools).  Perhaps it is because youth sports have become a $15-billion-a-year industry that requires parents to devote significant time, resources, and

As the Court explains below, John's learning disabilities caused his ineligibility under the Rule and his request for a waiver of the Rule is a reasonable accommodation.  The evidence in the record convinces the Court that the Rule should not apply here.  Other equitable considerations further convince the Court that the Rule should not apply.

John is not an all-star and his school's athletics program is not positioned to win a state championship.  It's simple: John wants to be part of a team during his senior year of high school.  Like Daniel Ruettiger in the beloved film Rudy, John wants the memory of playing on the field (or court) with his teammates.[11]  He is not trying to be the best, take someone else's place, or gain an unfair advantage.  He just wants to play.  For that and the reasons below, the Court GRANTS John's Motion for a Permanent Injunction, ECF No. 6.

---

energy.  See Linda Flanagan, The Downsides of Having an Athlete in the Family, The Atlantic (Aug. 3, 2022); Randi Mazzella, Overzealous Parents are Ruining Youth Sports.  It's Past Time to Sit Quiet and Let the Kids Play., Wash. Post (Mar 2, 2022), https://www.washingtonpost.com/lifestyle/2020/03/02/overzealous-parents-are-ruining-youth-sports-heres-how-do-better/.  At their root, team sports are no different than any other extracurricular.  Sports, like other school-sanctioned activities, give students an outlet to socialize, be part of a community, and use their creativity.  This appears to have been forgotten in the world of high school athletics.

[11] Rudy (Sony Pictures Entertainment 1993).

## I.    BACKGROUND

### A. John's Academic History

In the fall of 2020, John enrolled in a Rhode Island parochial school as a freshman. Verified Compl. ("VC") ¶ 6, ECF No. 1. Like much of the country at the time, the school had transitioned to remote learning because of the COVID-19 pandemic. Id.; DXB, James Doe Dep. (Jan. 10, 2024) ("James Dep.") 28-29, ECF No. 11-2. The pandemic also prevented John – who is involved in competitive football and basketball – from playing interscholastic sports during the fall semester of his freshman year. VC ¶ 6; James Dep. at 30-31. Instead, students played fall-semester sports during the spring semester. VC ¶ 6; James Dep. at 30-31. John ended his first freshman year with a grade point average of 89.0 out of 100. DXC, John's Boarding School Application (Jan. 15, 2021) ("Application") 47, ECF No. 11-2.

John's parents believed there was a "disconnect" between his intellect and his academic performance. James Dep. at 28-29. Consequently, John's parents transferred him to an out-of-state boarding school to benefit from a smaller, more structured environment and opted for him to repeat his freshmen year during the 2021-22 school year. VC ¶ 7; James Dep. at 37. His parents believed the boarding school would have a connected community, smaller learning environment, and rigorous academic curriculum. James Dep. 39-42. John's parents, based on advice they had

received, had him repeat freshman year to get the "full four-year experience" and benefit from more maturity.  Id. at 43-44.  At the time of his transfer, John had not been formally diagnosed with any learning disabilities.  VC ¶ 7.

John's time at the boarding school, however, only exasperated the disconnect his parents perceived.  He struggled academically, did not connect with his peers, and did not receive the individualized support that his parents had expected, though he did play competitive sports during that time.  James Dep. at 46-48; DXD, Evaluation Report (Aug. 2022) 94-95, ECF No. 11-2; DXD, John Doe Ltr. (Mar. 2023) 85-86, ECF No. 11-2; DXD, James and Jane Doe Ltr. (Mar. 2023) ("Parents' Ltr.") 87-88, ECF No. 11-2.  John received grades equivalent to a B+, C+, B+, and B.  Application at 47.  John became depressed, lost significant weight, and returned home after the 2021-22 school year.  James Dep. at 46-48, 53-55; Parents' Ltr. at 87-88.  Subsequently, during the summer of 2022, John's pediatrician and psychiatrist formally diagnosed him with certain learning disabilities including ADHD, anxiety, and major depressive disorder, and identified writing and reading impairments.  VC ¶ 9; James Dep. at 53-57; Parents' Ltr. at 88.  John's pediatrician prescribed medication and regular therapy sessions.  James Dep. at 55-57.  John also received advice to continue participating in competitive sports.  VC ¶ 11; James Dep. at 69-70.

John enrolled at a Rhode Island private school as a sophomore for the 2022-23 school year where he received academic accommodations, an individualized learning plan, and other support to address his learning disabilities. James Dep. at 57-58, 68-69. He also participated in competitive sports. Id. at 57-58; DXD, Attorney Ltr. 83, ECF No. 11-2; DXD, John Ltr. 85-86, ECF No. 11-2. John's condition improved, in part, because of his participation in sports. VC ¶ 12; James Dep. at 57-58; Parents' Ltr. at 88. According to John's father, John is "thriving" and has experienced academic, social, physical, and psychological improvements. James Dep. at 57-58. John is currently a junior at the private school for the 2023-24 school year and will enroll at the school for his senior year. VC ¶ 13. Over the past two years, John has been on the varsity football and basketball teams and would like to continue his involvement next academic year. Id.; James Dep. at 80.

## B. RIIL and the Eight-Semester Rule

RIIL is a non-profit organization that administers, regulates, and supervises competitive high school sports in Rhode Island. VC ¶ 3; DXE, RIIL Mission Statement 115, ECF No. 11-2; DXG, RIIL Rules and Regulations ("RIIL R&R") art. 1, § 2, ECF No. 11-2. The League counts seventy-two schools as its members, including public, private, and parochial schools, all of which pay membership dues so their students can participate in competitive

sports.  See VC ¶ 3; RIIL Mission Statement at 115; DXL, Michael Lunney Dep. (Jan. 18, 2024) ("Lunney Dep.") 10, ECF No. 11-2; RIIL R&R art. 1, § 13.  The League is governed by the Principals' Committee on Athletics, which is composed of principals and assistant principals from member schools.  RIIL R&R art. 1, § 2; see Lunney Dep. at 10.

The Eight-Semester Rule is articulated under Article III, Section (5)(B)(2) of the League's Rules and Regulations, which limits a student's eligibility to play competitive sports to eight consecutive semesters from the time the student first becomes a high school freshman.  VC ¶ 21; Lunney Dep. at 21.  A student is automatically ineligible for athletic competition four years from the date of entry into ninth grade.  Students may seek a waiver of the Rule.  See RIIL R&R art. 1, § 16.  A waiver, however, is "exceptional and extraordinary relief."[12]  Id. § 16(F).

The waiver process begins when a student submits a Waiver Request Form that includes accompanying documents such as transcripts, letters of support, medical documents, and documents relating to a student's individualized education plan.  Id. § 16(A)-(B).  The request is then reviewed by the Waiver Request Hearing Committee ("Waiver Committee"), which is composed of

_____

[12]  Over the past 10 years, RIIL has granted 34 waivers of the Eight-Semester Rule out of the 64 requests that it has received. DXJ, Interrogatories of "8 Semester" Waivers Granted 146, ECF No. 11-2.

principals of member schools.  Id. § 16(D).  A student seeking a waiver on the basis of an undue hardship bears the burden of

> convinc[ing] sixty percent (60%) of the [Waiver] Committee present and voting of the extenuating circumstances constituting undue hardship.  Undue hardship means a hardship peculiar to the student-athlete or individual caused by unforeseen events beyond the election, control or creation of the student-athlete or individual, his/her family, or school.  The Committee interprets undue hardship particular to the situation of the individual which is so severe that normal application of the Rule(s) is not . . . necessary to carry out the spirit or the orderly enforcement of the Rule.

Id. § 16(F) (the "undue hardship standard").  Those seeking a waiver on the basis of a disability must

> show that his/her inability to meet the RIIL rule(s) is the result of a disability, and that s/he otherwise meets all of the essential requirements of participation in RIIL competition with or without a reasonable modification.  The party making a waiver request shall state on the request form that a disability is claimed and specifically identify the disability and hardship.  The party making the request shall also provide the Committee with all appropriate evidence documenting his/her disability and hardship, including medical evidence and any applicable [individualized education plan].

Id. § 16(H) (the "disability standard").

**C. RIIL Denies John's Waiver Request**

John applied for a waiver of the Rule in March 2023.  Ex. A VC, RIIL Waiver Request Form (Mar. 2023), ECF No. 1-1.  The League's Waiver Committee reviewed his application and held a hearing in April 2023.  See Ex. B VC, Waiver Hearing Committee Decision (Apr. 27, 2023) ("RIIL Decision"), ECF No. 1-2.  In his

application, John asserted that he needed to play competitive sports for a fifth year to, among other reasons, maintain his positive self-esteem, emotional well-being, and his ability to engage in the classroom. Attorney Ltr. at 84. The application also described the challenges he faced while he was enrolled in the boarding school. Id. at 82-83; Evaluation Report at 94-95. Attached to the application were letters of support from his parents, psychiatrist, and family attorney. The Waiver Committee heard testimony from John, his parents, the private school's athletic director, and his family attorney. See RIIL Decision 1.

The Waiver Committee unanimously denied John's request, which the League's Principals' Committee on Athletics unanimously upheld on appeal. Id. at 4; VC ¶ 19; DXH, Principals' Committee on Athletics Decision (Aug. 24, 2023) ("Principals' Decision") 138-41, ECF No. 11-2; see also RIIL R&R art. 1, § 16(E) (outlining process to appeal Waiver Committee decisions). In its decision, the Waiver Committee reasoned that it was John's parents' "personal choice" to have John transfer to the boarding school and re-classify as a freshman despite receiving good grades while enrolled in the parochial school. RIIL Decision at 2. It also noted that John transferred to the boarding school because he did not receive enough academic support at the parochial school. Id. Moreover, it found that, by the time he becomes a senior, he would have played eight semesters of sports. See id. at 2-3.

Because the Waiver Committee concluded that John's ineligibility was not caused by his disability, it applied the undue hardship standard rather than the disability standard. Id. at 3; Lunney Dep. at 65-66. Though the Waiver Committee did not apply the disability standard, it nonetheless considered John's learning disability in its calculous. See Lunney Dep. at 66. Consequently, the Waiver Committee did not make any findings concerning whether a waiver would be a reasonable accommodation for John or would fundamentally alter the nature of athletic competition among member schools.

A few months after the Principals' Committee upheld the denial, John filed this lawsuit, alleging that RIIL violated his rights under the Americans with Disabilities Act as applied, and moved for a preliminary injunction. See generally VC; Mot. Prelim. Inj., ECF No. 6. Following a conference, the parties agreed to engage in a brief, 60-day period of discovery rather than conduct an evidentiary hearing. Text Order (Oct. 23, 2024). By agreement, the parties converted the motion to one for a permanent injunction. See Suppl. Mem. Supp. Mot. Inj. Relief ("Pl. Mem.") 1 n.1, ECF No. 10; Def.'s Mem. Law Supp. Opp'n ("Def. Mem.") 1, ECF No. 11-1. The Court granted leave to Disability Rights of Rhode Island ("DRRI") to file an amicus brief in support of John. Text Order (Apr. 23, 2024); see DRRI Br. Amicus Curiae, ECF No. 15. The Court

held a hearing on the merits – as provided for by the parties'
agreement – on April 25, 2024.

## II.  STANDARD OF REVIEW

To obtain a permanent injunction, the plaintiff must first
make a showing of "actual success" on the merits, and not "only a
showing of likelihood of success on the merits" as is required for
a preliminary injunction.    NACM-N.E., Inc. v. Nat'l Ass'n of
Credit Mgmt., Inc., 927 F.3d 1, 4 (1st Cir. 2019); see Amoco Prod.
Co. v. Village of Gambell, 480 U.S. 531, 546 n.12 (1987).  Second,
the plaintiff must show four additional factors:

> (1) that it has suffered [or will suffer] an irreparable
> injury [absent injunctive relief]; (2) that remedies
> available at law, such as monetary damages, are
> inadequate to compensate for that injury; (3) that,
> considering the balance of hardships between the
> plaintiff and defendant, a remedy in equity is
> warranted; and (4) that the public interest would not be
> disserved by a permanent injunction.

eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006); see
United States v. Mass. Water Res. Auth., 256 F.3d 36, 50 n.15 (1st
Cir. 2001).

## III.  DISCUSSION

Of the factors above, the parties do not dispute that there
are no other remedies at law that would adequately compensate John
for his future injury.  At its core, John wants to play competitive
sports during his senior year.  Other remedies, such as monetary
damages, would not address the impending harm of being denied the

right to play sports.    Only an injunction preventing the application of the Rule would make John whole.    Thus, this factor for a permanent injunction is met.    The Court will address the other disputed factors in turn.

## A. Actual Success on the Merits

John alleges the League violated Titles II and III of the ADA as applied by denying him a waiver.    "[T]he ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)."  PGA Tour, Inc. v. Martin, 532 U.S. 661, 675 (2001) (footnotes omitted). "Congress enacted the ADA 'to address the major areas of discrimination faced day-to-day by people with disabilities,' hoping 'to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals.'"  Dudley v. Hannaford Bros. Co., 333 F.3d 299, 303 (1st Cir. 2003) (citations omitted) (first quoting 42 U.S.C. § 12101(b)(4); and then quoting id. § (a)(8)).

Title II of the ADA "prohibits discrimination against persons with disabilities by 'public entities.'"  Parker v. Universidad de P.R., 225 F.3d 1, 4 (1st Cir. 2000) (quoting 42 U.S.C. § 12132). The statute provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The statute defines a "qualified individual with a disability" as

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

Id. § 12131(2).

To succeed on a Title II claim, a plaintiff must establish "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability."  Parker, 225 F.3d at 5; see 42 U.S.C. § 12132.

Likewise, Title III provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation."  42 U.S.C. § 12182(a); see Dudley, 333 F.3d at 303 ("[Title III] sends a bluntly worded message . . . : you may not discriminate against an individual in the full and equal access to goods and services on the basis of a disability.").  The statute

also stipulates that "a failure to make reasonable modifications . . . when such modifications are necessary" is discrimination unless the entity in question can show that "such modifications would fundamentally alter the nature" of the program.  42 U.S.C. § 12182(b)(2)(A)(ii).

> To succeed on a Title III claim,
>
> the plaintiff must show that [1] the defendant has a discriminatory policy or practice in effect; [2] that he (the plaintiff) requested a reasonable modification of that policy which, if granted, would have afforded him access to the desired goods[, services, facilities, privileges, advantages, or accommodations]; [3] that the requested modification – or a modification like it – was necessary to afford that access; and [4] that the defendant nonetheless refused to modify the policy or practice.

Dudley, 333 F.3d at 307 (citing Martin, 532 U.S. at 663 n.38; Amir v. St. Louis Univ., 184 F.3d 1017, 1027 (8th Cir. 1999); and Johnson v. Gambrinus Co./Spoetzl Brewery, 116 F.3d 1052, 1058-60 (5th Cir. 1997)).  Once the plaintiff bears his burden of establishing a reasonable accommodation, the burden shifts to the defendant to show that such a modification would lead to a "fundamental alteration" of the policy or practice.  Massachusetts v. E*Trade Access, Inc., 464 F. Supp. 2d 52, 58 (D. Mass. 2006); see Dudley, 333 F.3d at 307-08 (elaborating that, once a reasonable modification is found, the defendant must implement it unless "doing so would alter the fundamental nature of its business, or

that the requested modification poses a direct threat to the health or safety of others" (citations omitted)).

Here, there is no disagreement that John's learning impairments qualify as a disability under the ADA. The parties instead dispute whether the ADA applies to RIIL; whether there is a causal connection between John's disability and his ineligibility to play competitive sports; and whether John sought a reasonable accommodation.

1. Whether Title II Applies to RIIL

Preliminarily, the Court must determine whether Title II and III of the ADA apply to the League. See Dudley, 333 F.3d at 307. In short, the answer is yes. The League concedes that Title III applies but disputes whether Title II applies. See Def. Mem. 8; Def.'s Reply Br. DRRI's Br. Amicus Curie 4, ECF No. 16.

Title II covers public entities, which are "ant State or local government . . . . [or] any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(A)-(B). RIIL argues that Title II does not apply to it because it is not a "public entity"; it is a voluntary, private, incorporated non-profit association that does not receive any state funding. Def. Mem. 8.

John argues that RIIL is an "instrumentality of the state" and is, thus, a "public entity" under the ADA. Pl. Mem. 24-25. In support, he relies on Dennin v. Connecticut Interscholastic

18

Athletic Conference, Inc., which found that Connecticut's version of RIIL – the Connecticut Interscholastic Athletic Conference ("CIAC") – was an "instrumentality of a State." 913 F. Supp. 663, 670 (D. Conn. 1996), appeal dismissed, vacated as moot, 94 F.3d 96 (2d Cir. 1996). There, the court placed significant weight on the fact that public schools both "delegate authority to CIAC to direct and control their athletic programs" and play a role in enforcing CIAC's policies. Id. In addition to these considerations, the court in Pottgen v. Missouri State High School Activities Ass'n emphasized that the state's athletic governing body (the MSHSAA) received funding from member schools. 857 F. Supp. 654, 661–62 (E.D. Mo. 1994), rev'd on other grounds, 40 F.3d 926 (8th Cir. 1991). The reasoning in Dennin and Pottgen is consistent with how other courts view the role of athletic governing bodies. See, e.g., Isler v. N.M. Activities Ass'n, 893 F. Supp. 2d 1145, 1155 (D.N.M. 2012) (collecting cases), rev'd on other grounds, No. 10-CV-009 MV/WPL, 2013 WL 12328907 (D.N.M. Sept. 25, 2013); Sandison v. Mich. High Sch. Athletic Ass'n, 863 F. Supp. 483, 487 (E.D. Mich. 1994), dismissed in part, rev'd in part, on other grounds, 64 F.3d 1026 (6th Cir. 1995) ("MHSAA is clearly an agency or other instrumentality of the state.").

Like the CIAC, MSHSAA, and MHSAA, RIIL is an "instrumentality of the state," and thus a "public entity" for purposes of Title III. RIIL serves as the managing authority for interscholastic

athletics in Rhode Island.  Member schools – a majority of which are public – delegate their authority to RIIL and allow it to use their facilities to host events and competitions.  RIIL's very own description supports the proposition that RIIL is an instrumentality of the state: "[RIIL] is a voluntary organization of principals who pledge their high schools and participants to follow the Rules and Regulations of the League. . . . The purpose of the [RIIL] is to supervise and administer the athletic programs, contests, and schedules and matters related thereto in participating schools of the State of Rhode Island."  RIIL Mission Statement 1 (emphasis added).  Though it does not receive funding directly from the state, it is mostly funded by the "membership dues and fees" from public schools.  Id.  Moreover, the governing bodies within RIIL are made up of principals and assistant principals, many of whom work for public school departments.  Id.; see also RIIL Decision at 2 (identifying members of Waiver Committee during John's hearing, all of whom are principals of public schools); Principals' Decision at 138 (reflecting that nine of the ten principals on the Principals' Committee on Athletics during John's hearing are employed at public schools).  Taken together, these facts convince the Court that RIIL is covered by Title II as a "public entity."

2. Whether John's Disability Caused His Exclusion

The League argues that John's disability did not cause his exclusion from competitive sports. Def. Mem. 10-12. Under Title II, a public entity is liable for disability discrimination if it excludes someone "by reason of [his or her] disability." 42 U.S.C. § 12132. This language requires a causal link between the plaintiff's disability and the defendant's discriminatory action. See Turner v. U.S. Postal Serv., No. 23-10752-MPK, 2023 WL 6448511, at *3 (D. Mass. July 28, 2023); Lewis v. Spurwink Servs., Inc., No. 2:22-cv-00054-NT, 2022 WL 17454078, at *4 (D. Me. Dec. 6, 2022); accord Washington v. Ind. High Sch. Athletic Ass'n, 181 F.3d 840, 848-49 (7th Cir. 1999); Starego v. N.J. State Interscholastic Athletic Ass'n, 970 F. Supp. 2d 303, 314 (D.N.J. 2013). Similarly, Title III imposes liability if the defendant discriminates against someone "on the basis of disability." 42 U.S.C. § 12182(a).

Several courts have had the opportunity to examine the extent to which there is a causal connection between a student's exclusion by an age-eligibility rule and his disability. RIIL heavily relies on the Sixth Circuit's decision in Sandison v. Michigan High School Athletic Ass'n. There, the plaintiff students stayed backed a year because of their learning disabilities and, as a result, were barred from participating by the MHSAA's rule prohibiting students who turn nineteen on or after September 1 from playing. Sandison,

64 F.3d at 1028. The MHSAA did not allow waivers of the rule. Id. at 1029. In reversing the preliminary injunction enjoining the MHSAA from preventing the students from playing, the Sixth Circuit reasoned that the plaintiffs' exclusion was a result of their age, not disability. Id. at 1032, 1036. In other words, their disabilities were not what caused the plaintiffs' ineligibility, but rather it was the "passage of time." Id. at 1031-33. The Sandison court found MHSAA's age-eligibility rule to be "neutral" in that it only applies when a student turns nineteen and is agnostic to a student's disability. Id. at 1033. This reasoning led the court to conclude that the students' exclusion was not "by reason of" or "on the basis of" the plaintiffs' respective disabilities.[13] Id.

John principally relies on two cases. First, he relies on Dennin, which involved a nineteen-year-old student with Down Syndrome who received special education and completed middle school in four years rather than three. 913 F. Supp. at 666. The

---

[13] RIIL also relies on Rhodes v. Ohio High School Athletic Ass'n, 939 F. Supp. 584 (N.D. Ohio 1996) which applied the reasoning of Sandison v. Michigan High School Athletic Association, 64 F.3d 1026 (6th Cir. 1995). See Def.'s Mem. Law Supp. Opp'n 11-12, ECF No. 11-1. The court in Rhodes found that the application of an eight-semester rule to a learning-disabled student, who had stayed back a year at a different school, did not constitute disability discrimination. 939 F. Supp. at 586-87, 592. The court further found that the plaintiff did not repeat freshman year only because of his disability, but also because he had an unpleasant and inadequate education at his original school. Id. at 592.

CIAC enforced a rule stating that students who turn nineteen on or after September 1 cannot play competitively. Id. The court enjoined the CIAC from applying its age-eligibility rule. Id. at 671. It reasoned that but for the plaintiff's disability, he would qualify under the age-eligibility rule. Id. at 669-71. The challenges related to the student's disability caused him to take longer to complete middle school, which made him ineligible under the CIAC's age-eligibility rule as a senior. See id.

Second, John relies on Washington v. Indiana High School Athletic Ass'n, a Seventh Circuit case that involved a learning-disabled student who dropped out after his tenth-grade year because of his academic struggles. 181 F.3d at 842. After dropping out, the plaintiff took a test that revealed he was learning disabled. Id. When he returned to the school, the plaintiff wanted to play on the school's basketball team. Id. Like the RIIL, the Indiana High School Athletic Association ("IHSAA") had an eight-semester rule and denied the plaintiff's request for a waiver. Id. at 842-43. Like in Dennin, the Seventh Circuit rejected Sandison's "passage of time" reasoning and affirmed the preliminary injunction enjoining the IHSAA, articulating that it was the plaintiff's disability that caused him to violate the rule. See id. at 848-49, 854. Had the plaintiff not dropped out because of difficulties associated with his learning disabilities, he would have complied with the rule. Id. at 848-49.

23

Much of the parties' briefing focuses on the time when John transferred from the parochial school to the boarding school and repeated freshman year. John's disability, it is agreed, did not precipitate these events. Not only was John not diagnosed with any learning disabilities by this time, but the record reflects he was doing well as a freshman in his parochial school, having an average GPA of 89.0 and a PSAT score in the 94th percentile in evidence-based reading and writing, and in the 96th percentile in math. Application at 47, 50, 67. Neither the paperwork from the parochial school nor the application material to the boarding school mentions academic or social difficulties. In fact, the application material emphasizes John's strong academic abilities. See, e.g., id. at 61 (noting John's "intellect was clear from a young age. He is a voracious reader and has [a] strategic math mind"). Moreover, John's father admitted that what drove the parents' decision to transfer John was the lack of sports in the fall due to the pandemic, the lack of "camaraderie and connectedness in the community," the limited communication among John and his friends, and the implementation of remote learning. James Dep. at 28-29; Evaluation Report at 94; see also James Dep. at 99-100 (agreeing with the RIIL Decision finding that it was a "personal choice" to have John transfer to a boarding school and repeat freshman year).

The record also reflects that John did not repeat freshman year because of his learning disabilities.  Based on advice John's parents received from the boarding school's administrators, advisors, and friends of theirs who have sent their children to boarding school, John "reclassif[ied] so that [he] [could] have a full four-year experience . . . and . . . [receive the] benefits of having a little more maturity and preparation for what is . . . a pretty rigorous academic environment."  James Dep. at 43-44.

If the Court were to consider only the facts related to the initial transfer, John's Motion would fail on the merits because the record does not demonstrate that it was his disability that caused John to transfer and repeat his freshman year.

The analysis changes, however, when looking at the fulcrum of events leading up to John's second transfer, from the boarding school to his current private school.  The League's counsel conceded at the hearing that, had the plaintiff not left the boarding school, he would have been eligible to play sports for the remainder of his time there.  See Hr'g Tr. at 11-12, 44-45; see also James Dep. at 46 (describing how it was James's understanding that John could have played four years of sports at the boarding school).  Said differently, the boarding school would have allowed him to play competitively through his senior year. It was only when John returned to Rhode Island to enroll in the private school that he fell under the jurisdiction of the League

25

and its Eight-Semester Rule.  <u>See</u> Hr'g Tr. at 44.  The Rule goes into effect once John enrolls in ninth grade, irrespective of where he is schooled, if he enrolls in a school governed by the RIIL. <u>See</u> <u>id.</u> at 44-46.

The record demonstrates that John transferred from the boarding school to the private school because of his disability. After enrolling at the boarding school, John experienced a decline in his academic performance and a deterioration of his physical and psychological health.  For example, John became isolated and anti-social, lost about sixty pounds, acted out, and failed to maintain routines for academic success.  James Dep. at 46-49, 51-54; Evaluation Report at 94-95.  This led to a decline in John's grades.  <u>See</u> James Dep. at 51-52.  At the same time, the boarding school did not provide the personalized attention or services to address John's needs.  <u>Id.</u> at 47-48; Attorney Ltr. at 83; Parents Ltr. at 87-88.  This required John to return to Rhode Island and enroll in a school that could adequately address his needs, for example, with an individualized support plan and counseling.  <u>See</u> James Dep. at 55-58; Attorney Ltr. at 82-83; John Doe Ltr. at 85; Parents' Ltr. at 88.

As in <u>Washington</u> and <u>Dennin</u>, he cannot comply with the Rule because of his transfer, which is directly a result of his disability.  But for his learning disability and related conditions, John would not have transferred from the out-of-state

26

boarding school back to the Rhode Island private school to receive appropriate educational programming. Had John not been suffering from anxiety, depression, and ADHD, among other impairments, he would have completed his time at the boarding school and played sports through his senior year. Cf. Washington, 181 F.3d at 849 (agreeing with the lower court that, but for the plaintiff's disability, he would have been "fully capable of performing in high school" and would not have had to drop out). Only when he returned to Rhode Island did he face the possibility of being prohibited from playing competitive sports during his senior year. Accordingly, the evidence establishes that there is a causal connection between John's disability and his inability to meet the requirements of the Rule.[14]

---

[14] In the RIIL Decision, the League improperly applied its own rules, preventing it from examining the extent to which John's disability caused his exclusion from playing sports during his senior year. Rather than apply the disability standard, it applied the undue hardship standard, even though John sought a waiver on the basis of his disability. Compare Ex. B VC, Waiver Hearing Committee Decision (Apr. 27, 2023) 2-3, ECF No. 1-2; DXL, Michael Lunney Dep. (Jan. 18, 2024) ("Lunney Dep.") 53, ECF No. 11-2; and PXC, Def.'s Answers Pl.'s First Set Interrog. 1, ECF No. 10-3 with Lunney Dep. at 63; and DXD, Attorney Ltr. 82-83, ECF No. 11-2. Under the League's disability rule – which roughly parrots the requirements of the ADA – the student must show that "his/her inability to meet the RIIL rule(s) is the result of a disability." RIIL R&R art. 1, § 16(H). By applying the undue hardship rule, rather than the disability rule, the Waiver Committee did not properly examine the causal nexus between John's disability and his ineligibility under the Rule.

Even if the League did apply the disability standard, that may not have solved the League's problem because the Rule does not appear to comply with the ADA. Under the Rule, in addition to

3. <u>Whether John Requested a Reasonable Modification</u>

The guiding framework for determining whether a modification is reasonable is outlined in <u>PGA Tour, Inc. v. Martin</u>, requiring courts to employ an "individualized inquiry."  532 U.S. at 688; see <u>Gelabert-Ladenheim v. Am. Airlines, Inc.</u>, 252 F.3d 54, 59 (1st Cir. 2001).  <u>Martin</u> examined the PGA Tour's walking rule, which requires golfers, during tournament play, to walk the entire golf course.  <u>Martin</u>, 532 U.S. at 666-67.  The purpose of the rule is to subject players to fatigue during competition.  <u>Id.</u> at 686.  The plaintiff in <u>Martin</u> was a professional golfer who had a degenerative circulatory disorder that limited his ability to walk without suffering serious complications.  <u>Id.</u> at 668.  Despite his documented medical issues with walking, the PGA denied his request to waive the walking rule and to utilize a golf cart.  <u>Id.</u> at 669.  In response, the plaintiff in <u>Martin</u> brought an action under Title

---

demonstrating that the student's disability caused his exclusion, the student must provide evidence of hardship.  <u>See</u> <u>id.</u>  Facially, this conflicts with the ADA because the statute requires an entity to provide a reasonable accommodation upon a showing of a qualifying disability, not an undue hardship.  <u>See</u> 42 U.S.C. §§ 12182(a), 12132.  By reverting to the "undue hardship" requirement, the Rule appears to impose additional criteria that raises the threshold for obtaining an accommodation, which is prohibited by the ADA.  <u>See</u> 28 C.F.R. § 35.130(b)(8) ("A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability . . . from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary.").  In short, both the face and application of the waiver rules appear flawed.

III, arguing that the PGA failed to accommodate his physical disability.  Id.

The Supreme Court concluded that allowing the use of a golf cart during tournament play was a reasonable accommodation.  Id. at 682.  To comply with the ADA, an entity's policies, practices, or procedures must be (1) reasonably modified for individuals with disabilities as necessary to afford access, (2) unless doing so would fundamentally alter what is offered.  Id.; see also 28 C.F.R. § 36.302(a).  In Martin, the Supreme Court found that waiving the walking rule would not fundamentally alter competition because it neither changed an "essential aspect" of the game nor gave the disabled plaintiff an advantage over other players.  Id. at 682-83.  Thus, waiving the rule would not upset the "fundamental character" or and "essential attribute" of the game.[15]  Id. at 684-85.  A determination of whether a modification is reasonable is a fact-specific inquiry.  Starego, 970 F. Supp. 2d at 309.  It is the defendants' burden to demonstrate that a reasonable modification "would alter the fundamental nature" of a program or

_____

[15] The reasonable accommodation analysis in PGA Tour, Inc. v. Martin, 532 U.S. 661, 675 (2001), also applies to Title II claims. See, e.g., Cruz v. Pa. Interscholastic Athletic Ass'n, 157 F. Supp. 2d 485, 498-99 (E.D. Pa. 2001); see also 28 C.F.R. § 35.130(b)(7)(i) ("A public entity shall make reasonable modifications . . . unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.").

"pose[] a direct threat to the health or safety of others."
<u>Dudley</u>, 333 F.3d at 307-08.

Waiving the Rule is a reasonable accommodation because doing
so is necessary to afford John access to competitive sports.  <u>See</u>
42 U.S.C. § 12182(b)(2)(A)(ii); <u>Martin</u>, 532 U.S. at 688.  But the
League argues that waiving the Rule with respect to John "would
alter the nature of the program." Def. Mem. 14.  It posits that
John would take the starting place of other students and cause
"[un]fairness" among student athletes. <u>Id.</u> at 15.  It principally
relies on two cases that found as such.  <u>See id.</u> at 13-15 (relying
on <u>McPherson v. Mich. High Sch. Athletic Ass'n</u>, 119 F.3d 453, 461-
63 (6th Cir. 1997); <u>Pottgen</u>, 40 F.3d at 929-31).

The League has not shown that a waiver would fundamentally
alter high school athletics in Rhode Island.  The Supreme Court in
<u>Martin</u> outlined two modifications that may "constitute a
fundamental alteration."  532 U.S. at 682.  Either the change
modifies an "essential aspect of the game" that affects all
competitors – <u>e.g.</u>, changing the diameter of a golf hole – or it
alters a "peripheral" rule that may "nevertheless give a disabled
player . . . an advantage over others."  <u>Id.</u> at 682-83.  Neither
are present here.

First, the Eight-Semester Rule is not an "essential aspect"
of competition.  <u>Id.</u> at 682.  What is essential are the rules for
the respective sports to ensure both fairness and safety among

students.    See, e.g.,    RIIL R&R art. 15, § 1,
https://www.riil.org/page/3045 (last visited May 28, 2024)
(mandating that all basketball games play according to the National
Federation of State High School Association Basketball Rules);
RIIL R&R, art. 19, § 1, https://www.riil.org/page/3049 (last
visited May 28, 2024) (outlining the rules of contact for
football).  Nor does it affect the League's governing values such
as "equity, fairness, and justice," "fair play and honorable
competition," and "treating people with dignity and respect."  RIIL
Mission Statement at 1.

To be sure, the Rule is not meaningless as it aims to prevent
redshirting,[16] ensure no student or team has an unfair advantage,
and maintain competitor safety.  Even still, the Rule is "at best
peripheral."  See Martin, 532 U.S. at 689.  This is because the
League, when pressed, did not articulate a justification for why
the Rule is essential to Rhode Island high school athletics.  The
League's explanation for why the Rule must be enforced here boils
down to the idiom, "rules are rules."  See Hr'g Tr. at 31-32, 39.
This explanation, however, cannot satisfy the League's burden on
its own.  Cf. Martin, 532 U.S. at 689 ("[P]etitioner's claim that
all the substantive rules . . . are sacrosanct and cannot be

---

[16]   Redshirting is the act of gaining a competitive advantage
over other students by repeating a year of school to have
additional time to grow, develop, and mature.  McPherson v. Mich.
High Sch. Athletic Ass'n, Inc., 119 F.3d 453, 456 (6th Cir. 1997).

modified under any circumstances is effectively a contention that it is exempt from Title III's reasonable modification requirement."). The League also suggests that the Rule is essential because it promotes harmony among the member schools. See Hr'g Tr. at 31-33. But the League did not explain how waiving the Rule here would upset that harmony.

More significant, however, was the League's concession that a student who, before enrolling in high school, spent two years in athletic training but only used a tutor without obtaining credit, would be allowed to play high school sports in Rhode Island if he were to enroll in ninth grade at fifteen or sixteen. See id. at 44-46. If that student could avoid the application of the Rule, which undermines the League's goal of preventing redshirting and protecting the health and safety of competitors, it is difficult to conclude that waiving the Rule with respect to John would fundamentally alter the nature of athletic programming. This workaround demonstrates that the Rule is not essential.

Second, there is no evidence that the waiver of this "peripheral" rule would give John or his team an unfair advantage over non-disabled students or other teams. See Martin, 532 U.S. at 682-85. The record is clear that John is not redshirting. In fact, John's father testified that John does not plan on playing sports in college. James Dep. at 110. Moreover, John would not be taking another student's place if he were to play, given that

every non-freshman makes the varsity team.  See id. at 83-85; Hr'g Tr. at 47-48.  And there is no evidence to suggest that he is guaranteed to have a starting position next year.  See James Dep. at 83-85.  This fact also leads the Court to conclude that a waiver for John would not upset fair competition in the state.  See Cruz, 157 F. Supp. 2d at 493, 500 (relying on the school's no-cut policy to discount the defendant's concern over plaintiff taking another student's place).  To put it bluntly, John's school does not seem to have an athletics program that is contending to win a state championship.  Given the dearth of evidence of John's athletic abilities and his father's own testimony, it is fair to say that John is not playing a fifth year of sports to be the next Roland Steele, see James Dep. at 110, undermining the League's argument that John's presence would fundamentally alter competition.  See Cruz, 157 F. Supp. 2d at 493, 499 (noting that the plaintiff student is not a "'star' player in any of his interscholastic sports" in concluding that allowing him to play would not "fundamentally alter" competition).

Taken together, there is no evidence to suggest that waiving the Rule here would alter an "essential aspect" of competition or give John or his team an unfair advantage.  See Pottgen, 40 F.3d at 932-33 (Arnold, J., dissenting) ("But if a rule can be modified without doing violence to its essential purposes, . . . I do not

believe that it can be 'essential' to the nature of the program or activity to refuse to modify the rule.").

*    *    *    *    *

In sum, John has demonstrated actual success on the merits. The record demonstrates that Titles II and III of the ADA apply to the League, John's disability caused his exclusion under the Rule, and a waiver of the Rule would be a reasonable accommodation that would not fundamentally alter the nature of high school athletic competition in Rhode Island.  The Court will now turn to the other equitable considerations.

**B. Irreparable Harm**

John would be irreparably harmed if barred from playing sports during his senior year.  As part of John's diagnosis for depression, anxiety, and ADHD, among his other diagnoses, doctors recommended that John get involved in interscholastic sports. That, along with medication and academic support, improved John's academic, social, physical, and psychological well-being.  This assertion is supported by John's psychiatrist, James Dep. at 55-58, and is recognized by the League's very own mission statement.[17]

_____

[17] RIIL Mission Statement at 115-16 ("Athletic competition is a major component [of] education. . . . Research indicates that student-athletes have better grades than non-athletes and that student-athletes have higher attendance rates and higher graduation rates than non-participants."); id. at 116 ("Sports and activities provide not only the opportunity to teach and learn respect for self and respect for others, they also place participants in a unique context - competition - that can further

Preventing John from being part of a team – competition and all – risks reversing the progress he has made in addressing his psychological challenges.  <u>See</u> <u>Cruz</u>, 157 F. Supp. 2d at 491-92, 500 (similarly finding that preventing the plaintiff student from participating in competitive sports would cause irreparable harm considering his IEP); <u>Dennin</u>, 913 F. Supp. at 667 (describing how preventing the student from playing interscholastic sports would irreparably harm the student's self-esteem and social skills); <u>cf.</u> <u>Washington</u>, 181 F.3d at 853 (positively considering the academic and social benefits that competitive sports have on the plaintiff's high school experience).

At an intangible level, if John were barred from playing competitively, he would miss out on creating unique memories as a senior in high school.  Simply put, John is only a senior once in his life.  As Coach Dan Devine said in <u>Rudy</u>, "And for you seniors, it's your last one, so make it count because you'll remember it for the rest of your lives."[18]  Such memories are priceless and constitute irreparable harm in their absence.  <u>See</u> <u>Lyon v. Ill.</u> <u>High Sch. Ass'n</u>, No. 13 C 173, 2013 WL 309205, at *5 (N.D. Ill. Jan. 25, 2013) (finding the student's argument that he may miss "a once in lifetime opportunity" by not playing sports persuasive if

---

instill and hone values necessary for the development of respect for self and respect for others.").

[18] <u>Rudy</u> (Sony Pictures Entertainment 1993).

it had to consider the student's irreparable harm, albeit the student did not establish a likelihood of success on the merits).

The League avers that John would not be irreparably harmed because he could still practice and scrimmage with the team and assist in charitable work.    Def. Mem. 19; Hr'g Tr. at 38-39. Anyone who has played high school sports or engaged in other competitive activities know that just practicing with a team is no substitute to being part of a team in competition, especially during one's senior year.    Relegating John to just practice would fundamentally alter his athletic experience.    It is not difficult to imagine that being excluded from competition would also change the way he and his teammates would practice, seeing as there is no incentive for the team to actively integrate him in practice.    And the League's argument does not tackle the very real possibility that preventing John from competing with his team would negatively affect his progress in addressing his disabilities.    Accordingly, the Court finds that John would be irreparably harmed absent injunctive relief.

**C. Balance of Equities**

In balancing the equities, the Court concludes that the harm imposed on John is greater than that imposed on RIIL.    As discussed above, by not competing, John could lose out on athletic programs that have had a substantial benefit on his overall well-being and

36

his efforts to overcome his learning disabilities, in addition to the memories he would gain by playing.

The League complains of the floodgate of requests that it could receive if the Court were to grant the injunction. Def. Mem. 20-21. RIIL's assertion, however, is neither backed by adequate evidence, nor compelling even if true. Over the past ten years, it has received 64 waiver requests, an average of a little under 7 per year. Id. at 20. Of those requests, the League does not identify those like John's situation that would likely be approved if the League complied with the ADA. And the League does not endeavor to predict how many students would seek a waiver if the Court finds in John's favor. Given that the exigencies of the COVID-19 pandemic are behind us and the unusual nature of John's predicament, a scenario in which the League will be inundated with waiver requests like John's seems unlikely. But more importantly, the League's point amounts to saying that accommodating people with disabilities is hard and they should not have to do it. Treating people with disabilities with sensitivity and compassion may take some effort and require previously unimagined flexibility, it is true. But that is what living in a civilized society is all about and what the law demands of us.

In summary, the balance of equities weighs in John's favor. See Washington, 181 F.3d at 853 (finding no abuse of discretion where the lower court valued the benefits of competitive sports to

the plaintiff over the concerns of the sports league, namely the administrative burdens, the fear the plaintiff would take another student's place, and potential unfair advantages).

### D. Public Interest

A permanent injunction would not negatively affect the public interest. In fact, it would serve the public interest. Achieving the goal of full inclusion of disabled individuals in economic and social life is in the public's interest. See Martin, 532 U.S. at 674-75; Dudley, 333 F.3d at 303. Allowing disabled students to play in competitive sports contributes to that goal. Steines ex rel. Steines v. Ohio High Sch. Athletic Ass'n, 68 F. Supp. 3d 768, 783 (S.D. Ohio 2014). Moreover, there is no evidence in the record to suggest that John's involvement in competitive sports would significantly affect the level of competition within the league, pose any harm to other students, or displace other students. See Washington, 181 F.3d at 853-54. Thus, the public interest would not be adversely affected in issuing a permanent injunction here.

### IV. CONCLUSION

Rudy had no business playing on the Norte Dame football team. As a defensive end, he simply did not have the skills like his compatriots. Nevertheless, with the support of his cheering teammates and fans packed in Notre Dame Stadium, he got his chance to play. Why? Because everyone recognized the importance of Rudy having his one moment, one memory, playing as a senior with the

Fighting Irish.  John Doe is like Rudy.  He may not be a future Heisman Trophy recipient, but, even so, he deserves his moment to play competitively with his team as a senior.  Those are the memories that will stick with him.

     This Court says, let the kid play.  Accordingly, for the reasons above, Plaintiffs' Motion for a Permanent Injunction, ECF No. 6, is GRANTED.


IT IS SO ORDERED.

_____
William E. Smith
District Judge
Date: May 28, 2024