# United States Court of Appeals
## For the First Circuit

---

No. 24-1619

JAMES DOE, Individually and as Natural Parent and Next Friend of
John Doe; and JANE DOE, Individually and as Natural Parent and
Next Friend of John Doe,

Plaintiffs, Appellees,

v.

RHODE ISLAND INTERSCHOLASTIC LEAGUE,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

---

Before

Gelpí, Lynch, and Howard,
Circuit Judges.

---

Amy B. Yarbro, with whom Jessica M. Savino and Morrison
Mahoney LLP were on brief, for appellant.

Scott R. Eldridge, Erika L. Giroux, and Miller, Canfield,
Paddock & Stone, PLC on brief for The Michigan High School Athletic
Association, amicus curiae.

Bennett L. Cohen, Russell S. Jones, Jr., and Polsinelli PC on
brief for National Federation of State High School Associations,
amicus curiae.

James A. Ruggieri and Higgins, Cavanagh & Cooney, LLP on brief
for Pennsylvania Interscholastic Athletic Association, Inc.,
amicus curiae.

<u>Kevin W. Stone, Jr.</u>, with whom <u>Robert Clark Corrente</u> and <u>Whelan Corrente & Flanders LLP</u> were on brief, for appellees.

<u>Mark C. Hadden</u> on brief for Disability Rights Rhode Island, amicus curiae.

---

May 16, 2025

---

**HOWARD**, <u>**Circuit Judge**</u>.    After repeating his freshman year of high school, plaintiffs-appellees' son John Doe asked the Rhode Island Interscholastic League ("the League") to waive its eight-semester limit on participation in interscholastic athletics so that he could continue to play competitive sports in his senior year.    Doe asserted that such a waiver was a necessary and reasonable accommodation under Titles II and III of the Americans with Disabilities Act ("ADA") for his several psychological disabilities.    After the League refused, Doe obtained a permanent injunction allowing him to play through the end of the 2024-2025 academic year.    Because Doe's ineligibility under the League's rules is unrelated to his disability, and allowing him to play in violation thereof would fundamentally alter the League's interscholastic athletics program, we vacate the district court's injunction.

I.

To the extent that they align with the record, we draw the facts from the district court's opinion.    <u>See</u> <u>Dudley</u> v. <u>Hannaford Bros. Co.</u>, 333 F.3d 299, 301 (1st Cir. 2003).

A.

Competitive extracurricular athletics demand considerable coordination among participating schools and their teams.    Nationally, about ninety percent of high schools belong to an athletics association in their state, each of which promulgates

the rules and regulations critical to managing this necessarily collaborative endeavor among its member-schools. In Rhode Island, this work is done by the League, a non-profit body made up of public, private, and parochial high schools that voluntarily opt into membership. More than seventy high schools in Rhode Island participate, collectively offering athletics programs in thirty sports. Much like its counterparts in neighboring states, as described in its mission statement, the League exists to centrally "supervise and administer" these "athletic programs, contests, and schedules" across the participating schools and thereby provide "governance and leadership" for those programs. The League aims to do so in accordance with governing values such as "fair play and honorable competition" as well as "good sportsmanship and ethical conduct." Among its many subsidiary objectives, the League specifically aims to "promote even competition and maximum participation" across Rhode Island's high school sports programs.

Consistent with this mission, member-schools rely on the League to "formulate minimum uniform and equitable standards of eligibility that must be met by students" to participate in their athletics programs. This centralized governance model helps to ensure that competition between the member-schools' teams is "fundamentally fair and equitable" and that the member-schools enjoy a "harmonious relationship" notwithstanding their competitive posture. The League's eligibility requirements

provide that students must enroll in the school for which they play (with exceptions for those at certain technical schools and qualifying home schools), be enrolled in or have completed the ninth grade, be younger than nineteen years of age as of September 1 of the relevant academic year, maintain passing marks in at least sixty percent of their contemporaneous courseload, and complete a "pre-participation athletic physical." Relevant here, the League has an Eight-Semester Rule ("the Rule"), which limits the duration of students' eligibility: "Once a student enters the 9th grade, whether in a junior high school or a four-year high school, that student is limited to eight (8) consecutive semesters of eligibility and automatically becomes ineligible for athletic competition four years from the date of entry into the ninth grade."

Students who are ineligible according to the League's rules may request a waiver, which the rules describe as "exceptional and extraordinary relief." The review process that the League provides for such waivers is tripartite. First, the League's Executive Director makes an initial determination on whether to grant a requested waiver. Next, if the Executive Director issues "[a] negative decision," that decision may be appealed to the League's Waiver Request Hearing Committee ("Waiver Committee"), which consists of four high school administrators and the "Chairperson" of the League's Principals' Committee on

Athletics ("Principals' Committee").  "A majority vote of the members present" at one of the Waiver Committee's triannual hearings is required to decide an appeal.  Finally, a decision by the Waiver Committee may be appealed again to the Principals' Committee itself, which, "[i]n extenuating circumstances, which would cause undue hardship," may waive an eligibility rule if approved "by 60% of the members of the [Committee] present and voting."

### B.

John Doe has been a student-athlete since elementary school.  He began playing basketball as early as the second grade, and by the third or fourth grade, he picked up baseball, both of which he continued to play in middle school.  In the seventh and eighth grades, Doe added flag football to the mix as well.

Doe enrolled at a parochial high school in Rhode Island as a freshman in the fall of 2020.  The COVID-19 pandemic delayed the high-school phase of Doe's athletic career, as the parochial school did not offer extracurricular sports that fall.  Like many at that time, Doe's parents lamented the resulting lack of "camaraderie and connectedness to the community" and that Doe "felt really disconnected."  As the pandemic abated, however, Doe's athletic career resumed; later that academic year, he played "abbreviated" seasons of basketball, football, and track.  Doe also performed well academically at the parochial school,

- 6 -

averaging eighty-nine percent grading in his freshman year. Nonetheless, he began to meet with a tutor to mitigate some shortcomings in his performance identified by his teachers.

The next academic year, 2021-2022, to get "the benefit of community, more personalized attention, . . . more structure, and a little more independence," as well as an in-person learning experience, Doe's parents transferred Doe to an out-of-state boarding school. In doing so, Doe's parents elected to enroll him as a freshman at the boarding school, "reclassifying" him such that he repeated the ninth grade. This decision was advised by their boarding-school consultant to ensure that Doe would "have a full four-year experience at the boarding school" with the benefit of "a little more maturity and preparation" for its academic rigor. In his reprised freshman year there, Doe played a sport every season: football in the fall, basketball in the winter, and lacrosse in the spring.

Doe ended the 2021-2022 academic year at the boarding school with strong grades overall. Even so, according to him and his father, Doe struggled socially and academically, earned lower grades than he had at the parochial school, lost a significant amount of weight, and began to exhibit symptoms of a depressive disorder. The following summer, Doe was diagnosed with anxiety, depression, Attention-Deficit/Hyperactivity Disorder ("ADHD"), and several other learning disorders. Doe's parents elected to

transfer Doe back to Rhode Island, this time to a different private school than the one he attended in the 2020-2021 academic year. Because by this point Doe had only completed his "freshman" year, albeit twice (at the parochial school and again at the boarding school), he began the 2022-2023 academic year as a sophomore. He also received an Individual Support Plan ("ISP") and other academic accommodations that fall (such as, e.g., being afforded extended time on standardized tests). His wellbeing improved at the private school, where he played varsity football and basketball that fall and winter, respectively.

During the summer of 2022, in conversations with the private school's athletics director shortly before Doe enrolled, Doe's parents became aware of the Rule and its applicability to Doe. By the Rule's terms, Doe would be ineligible to play sports in his senior year at the private school, as he had entered the ninth grade at a member-school of the League (the parochial school) in the fall of 2020 and would complete eight consecutive semesters from that point as of the spring of 2024, the end of his junior year at the new private school. Also a member-school of the League, the private school was subject to the Rule and therefore prohibited from allowing Doe to play competitive sports in what would amount to his fifth year of high school.

In March 2023, Doe's parents formally requested an eligibility waiver of the Rule from the League "for his senior

year, the 2024-2025 academic year."  In a letter from their attorney, Doe's parents styled the request as one for a reasonable accommodation under the ADA, asserting that "[his] disabilities are the sole reason for the request," and that "if [he] did not have the undiagnosed learning disabilities, he would have been able to stay at [the parochial school] or another [Rhode Island] school and there would be no need for a waiver."  In support of their request, Doe's parents appended written statements from Doe and themselves, a letter from his tutor, a psychoeducational evaluation report, his report cards from the three schools he had attended, and various transfer application materials.[1]

The Waiver Committee held a hearing in April 2023, during which they heard testimony from Doe, both of his parents, their attorney, and the private school's athletics director.  In addition to the documents submitted with the waiver request, the Waiver Committee reviewed Doe's submitted medical records, his ISP, and letters from his psychiatrist and the private school's Director of Wellness.  A few days later, the Waiver Committee issued a decision

---

[1]  The League does not contest on appeal that Doe was disabled as of the time he submitted this waiver request.  It does point out, however, that Doe's learning disability did not prevent him from playing sports and that, at least in his initial years of high school, it apparently did not prevent him from getting good grades either.  For instance, the records from the boarding school show that he finished the year with three "honors with commendation" grades, two "high pass with commendation" grades, one "high pass" grade, and one "satisfactory" grade.

unanimously denying Doe's request, concluding that "the documentation and testimony presented did not establish an academic or athletic hardship to perform a waiver" of the Rule.

Doe appealed the decision to the Principals' Committee. The Principals' Committee held another hearing in August 2023, at which the same individuals testified and the same exhibits were submitted as before the Waiver Committee, with the addition of another letter from Doe's psychiatrist, a letter from his primary care physician, and documentation of his standardized testing accommodations. The Principals' Committee unanimously affirmed the denial of the waiver in September 2023, agreeing with the Waiver Committee that "the documentation and testimony presented did not establish an academic or athletic hardship to support a waiver" of the Rule.

### C.

Following the League's denial, Doe filed this action in the District of Rhode Island in October 2023. The complaint alleged that the League's refusal to grant Doe a waiver of the Rule violated Titles II and III of the ADA. Doe sought declaratory relief and an injunction to prevent the League from enforcing the Rule against him. Following a brief discovery period and written submissions, the district court held a hearing on Doe's motion for injunctive relief in April 2024.

Shortly thereafter, the district court issued an order granting the permanent injunction, concluding that all four factors considered in deciding whether to grant one -- actual success on the merits, irreparable harm, the balance of equities, and the public interest -- weighed in Doe's favor. <u>Doe</u> v. <u>R.I. Interscholastic League</u>, 735 F. Supp. 3d 99, 108-18 (D.R.I. 2024). Relevant here, the district court limited its analysis of the merits to the elements of an ADA claim disputed by the parties: whether Title II applied to the League, whether Doe's waiver denial was caused by his disability, and whether his requested accommodation was reasonable. <u>Id.</u> at 110. As to the first, the district court -- reasoning by analogy to other courts' application of Title II to athletics associations in other states -- concluded that the League is an "instrumentality of the state" and thus a "public entity" subject to Title II. <u>Id.</u> at 110-11. Next, the district court found that even though Doe's disability was not the cause of his transfer to the out-of-state boarding school, it was the cause of his second transfer from there to the second Rhode Island private school. <u>Id.</u> at 111-13. Doe's disability was therefore the but-for cause of his waiver's denial, according to the district court, since "he would have completed his time at the boarding school and played sports through his senior year" "[h]ad [he] not been suffering from anxiety, depression, and ADHD, among other impairments." <u>Id.</u> at 113.

Finally, the district court reasoned that the waiver of the Rule that Doe sought was "a reasonable accommodation because doing so is necessary to afford [him] access to competitive sports" and the League did not show that it was either an "essential aspect" or a "'peripheral' rule" that disadvantaged other students.  Id. at 113-16 (quoting PGA Tour, Inc. v. Martin, 532 U.S. 661, 682-83 (2001)).  Finding that a waiver would be a reasonable accommodation under both Titles II and III, the district court granted Doe's request for a permanent injunction permitting him to play competitive sports in contravention of the Rule during his fifth year of high school.  Id. at 118.

The League appeals.

## II.

"A district court's decision to grant a permanent injunction involves factual, legal, and discretionary components. We therefore apply different standards of review[.]" Esso Standard Oil Co. v. López-Freytes, 522 F.3d 136, 142 (1st Cir. 2008).  While "questions of law are reviewed de novo," "the scope of the injunction is reviewed for abuse of discretion," id., and "[f]actual findings are reviewed for clear error," Healey v. Spencer, 765 F.3d 65, 73 (1st Cir. 2014).  In other words, we will only vacate a district court's injunctive relief on factual grounds where the record does not support a necessary factual finding made

by the district court.  See Contour Design, Inc. v. Chance Mold Steel Co., 693 F.3d 102, 109-12 (1st Cir. 2012).

For a district court to grant a permanent injunction, the plaintiff must show (1) "actual success on the merits of its claims;" (2) that he/she "would be irreparably injured in the absence of injunctive relief;" (3) that the harm suffered "from the defendant's conduct would exceed the harm to the defendant accruing from the issuance of an injunction;" and (4) that "the public interest would not be adversely affected by an injunction." United States v. Mass. Water Res. Auth., 256 F.3d 36, 51 n.15 (1st Cir. 2001).  On appeal, the League rests its challenge on the first prong, as to the actual merits of Doe's claims.  We limit our review accordingly.

In his complaint, Doe alleged that the League violated both Titles II and III of the ADA by "denying [his] request for a waiver of the Eight-Semester Rule," which he asserts is a "reasonable accommodation" for his disability.[2]  Titles II and III respectively provide for claims premised on a failure of a public entity (Title II) or place of public accommodation (Title III) to make reasonable accommodations for the plaintiff's disability.  To

---

[2] While the League contested Title II's application to it below, see Doe, 735 F. Supp. 3d at 110-11, for purposes of this appeal it does not dispute the district court's finding that Title II applies, so we assume the same.

bring a reasonable-accommodation claim under Title II, a plaintiff

must establish:

> (1) that he is a qualified individual with a
> disability; (2) that he was either excluded
> from participation in or denied the benefits
> of some public entity's services, programs, or
> activities or was otherwise discriminated
> against; and (3) that such exclusion, denial
> of benefits, or discrimination was by reason
> of the plaintiff's disability.

Parker v. Universidad de Puerto Rico, 225 F.3d 1, 5 (1st Cir. 2000)

(citing 42 U.S.C. § 12132). Title II defines a "qualified

individual with a disability" as:

> an individual with a disability who, with or
> without reasonable modifications . . . meets
> the essential eligibility requirements for the
> receipt of services or the participation in
> programs or activities provided by a public
> entity.

42 U.S.C. § 12131(2). Under Title III, meanwhile, a

reasonable-accommodation plaintiff must make the "six-part

showing" that:

> he comes within the protections of the ADA as
> a person with a disability . . . [;] that the
> defendant's establishment is subject to the
> mandates of Title III as a place of public
> accommodation . . . [;] that the defendant
> has a discriminatory policy or practice in
> effect; that he (the plaintiff) requested a
> reasonable modification in the policy or
> practice which, if granted, would have
> afforded him access . . . ; that the requested
> modification -- or a modification like
> it -- was necessary to afford that access; and
> that the defendant nonetheless refused to
> modify the policy or practice.

Dudley, 333 F.3d at 307 (citing 42 U.S.C. §§ 12102(2), 12181(7), 12182(b)(2)(A)(ii)).

Although Titles II and III differ in respects not germane to this appeal, the standards for the overlapping elements of reasonable-accommodation claims under them are the same. See Mary Jo C. v. N.Y. State & Loc. Ret. Sys., 707 F.3d 144, 153 (2d Cir. 2013) (noting that courts "apply[] [the] same standard in Title III case[s] as under Title II" for reasonable-accommodation claims). We thus analyze Doe's claims under the two sections in tandem, referring to them collectively as his "reasonable-accommodation claim."

Relevant here, both Titles II and III require that the plaintiff show (1) a causal nexus between his disability and his exclusion by the defendant and (2) that the accommodation he sought for his disability was reasonable. See Parker, 225 F.3d at 5; Dudley, 333 F.3d at 307. We consider each in turn, concluding that Doe's claim fails on both accounts.[3]

---

[3] The parties dispute whether the district court found the Rule facially violative of the ADA in light of the district court's comment in a footnote that "the Rule does not appear to comply with the ADA" and that the "face and application of the waiver rules appear flawed." See Doe, 735 F. Supp. 3d at 113 n.14 (emphasis added). Given Doe's specification in his complaint that "the Eight-Semester Rule is **facially** non-discriminatory"; the complaint's assertions only that the Rule "is unlawful, discriminatory, and violative" "as applied"; the district court's acknowledgment at the motion hearing that "the complaint is very specific that it is an as-applied challenge and not a facial challenge"; and the court's preface in its opinion that Doe alleged

**A.**

Titles II and III employ different statutory language to describe their requisite causation standards: Title II prohibits discrimination "by reason of" disability, 42 U.S.C. § 12132, and Title III bans discrimination "on the basis of" disability, id. § 12182(a).  Under both Title II and Title III, the burden is on the plaintiff to show that the disability is the cause-in-fact, or "but-for" cause, of the plaintiff's exclusion.[4]  See Finley v.

---

an as-applied challenge, see id. at 108, we read this footnote to contain the district court's passing observation, not a holding on which its imposition of the injunction relied.  See Mun. of San Juan v. Rullan, 318 F.3d 26, 28-29 (1st Cir. 2003) (discussing treatment of a "district court's editorial comments" as "mere dicta").

To the extent that the district court meant to find that the Rule facially violates the ADA, we disagree.  As the Supreme Court has held, a facial challenge lies only where a plaintiff "'establish[es] that no set of circumstances exists under which the [law] would be valid,' or he shows that the law lacks a 'plainly legitimate sweep.'"  Moody v. NetChoice, LLC, 603 U.S. 707, 723 (2024) (alterations in original) (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450 (2008)).  Doe has not made such a showing here.  Indeed, like the age restriction that confronted the Sixth Circuit in Sandison v. Michigan High School Athletic Association, 64 F.3d 1026, 1032-33 (6th Cir. 1995), the League's Rule is facially neutral and applies equally to both disabled and non-disabled individuals, as does the League's waiver process.  Moreover, there is no evidence in the record that application of either has had a disparate impact, and the Rule does not impose additional criteria making it more difficult for disabled persons to obtain waivers or other accommodations.

[4] We note that other circuits have also treated the standards as equivalent.  See McPherson v. Mich. High Sch. Athletic Ass'n, 119 F.3d 453, 459-61 (6th Cir. 1997); A.H. by Holzmueller v. Ill. High Sch. Ass'n, 881 F.3d 587, 592-93 (7th Cir. 2018).

Huss, 102 F.4th 789, 823 (6th Cir. 2024) ("[T]he plaintiff must prove that his disability caused the defendant's discriminatory behavior -- the "but-for" cause for ADA claims . . . ."); Crane v. Utah Dep't of Corr., 15 F.4th 1296, 1313 (10th Cir. 2021) ("We . . . join[] our sibling circuits in holding the ADA merely requires the plaintiff's disability be a but-for cause (i.e., 'by reason of') of the discrimination . . . ."); Haberle v. Troxell, 885 F.3d 170, 179 (3d Cir. 2018) ("[I]f the arrestee's disability was a 'but for' cause of the deprivation or harm he suffered, then the fourth element of an ADA claim has been met."); Wis. Comm. Servs., Inc. v. City of Milwaukee, 465 F.3d 737, 755 (7th Cir. 2006) ("Framed by our cases as a causation inquiry, this element is satisfied only when the plaintiff shows that, 'but for' his disability, he would have been able to access the services or benefits desired.").[5]

The Supreme Court has recently reaffirmed, in unequivocal terms, the longstanding principle that a given condition or event is only a but-for cause of a subsequent outcome when the condition or event is a necessary step to produce that

---

[5] Indeed, other circuits have concluded the same with respect to Title I, which contains a similar turn of phrase. See 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability" (emphasis added)); Akridge v. Alfa Ins. Cos., 93 F.4th 1181, 1192 (11th Cir. 2024) (collecting cases in the Second, Fourth, Ninth, and Eleventh Circuits).

outcome.  Bostock v. Clayton Cnty., 590 U.S. 644, 656 (2020); see also But-For Cause, Black's Law Dictionary (12th ed. 2024) ("The cause without which the event could not have occurred."); cf. Med. Marijuana, Inc. v. Horn, 145 S. Ct. 931, 945 (U.S. Apr. 2, 2025) ("Time and again, we have reiterated that . . . 'by reason of' language demands 'some direct relation between the injury asserted and the injurious conduct alleged.'  The key word is 'direct'; foreseeability does not cut it." (citation omitted) (quoting Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 268 (1992))).  Of course, a causal chain may consist of a sequence of necessary conditions or events, resulting in multiple but-for causes, and a but-for causation standard can therefore be "sweeping" by virtue of the many causes that it encompasses.  Bostock, 590 U.S. at 656-57.  Nonetheless, not all factors that may affect an outcome are but-for causes; others, such as "motivating factor[s]," do not count.  See id.  To distinguish which is which, the Supreme Court has articulated a clear test: if the elimination of the event at issue from the sequence of events would prevent the outcome altogether, it is a but-for cause.  Id.  "In other words, a but-for test directs us to change one thing at a time and see if the outcome changes.  If it does, we have found a but-for cause."  Id. at 656.

Here, the League based its denial of Doe's request for a waiver of the Rule on its stated conclusion that his

ineligibility was not because of his disability, but because he voluntarily chose to repeat the ninth grade.[6]  The League argues that, as such, Doe failed to establish the but-for causation required under Titles II and III.  To the contrary, the district court reasoned that Doe established a "causal connection between [his] disability and his inability to meet the requirements of the Rule" because "[b]ut for his learning disability and related conditions, [he] would not have transferred from the out-of-state boarding school back to the Rhode Island private school" where he again became subject to its restriction.  Doe, 735 F. Supp. 3d at 113.  On this record, however, we cannot agree with the district court's conclusion that Doe's disability was a but-for cause of his "inability to meet the requirements" of the Rule.  See id.

We are mindful that a district court's findings of factual causation underlying its injunctive relief are subject to clear-error review.  See Contour Design, 693 F.3d at 112.  As to Doe's first transfer, the district court considered his strong academic performance at the parochial school, his application

---

[6] The Waiver Committee considered and discussed the letter from Doe's counsel stating that Doe sought a disability waiver based on his learning disability, and the Waiver and Principals' Committees' decisions both referred to it.  Their use of the term "hardship" rather than "disability" is of no moment, and we do not share the district court's view that the Committees' word choice suggests that it "impose[d] additional criteria" beyond that permitted by the ADA.  See Doe, 735 F. Supp. 3d at 113 n.14.

materials to the boarding school, and his father's admissions that "what drove the parents' decision to transfer [Doe] was the lack of sports in the fall due to the pandemic, the lack of 'camaraderie and connectedness in the community,' the limited communication among [Doe] and his friends, and the implementation of remote learning." Doe, 735 F. Supp. 3d at 112. The district court further drew on testimony by Doe's father that Doe was reclassified as a freshman upon arriving at the boarding school "so that he could have a full four-year experience and receive the benefits of having a little more maturity and preparation for what is a pretty rigorous academic environment" to conclude that Doe "did not repeat freshman year because of his learning disabilities." Id. (cleaned up). We agree with the district court that this evidence demonstrates that Doe's reclassification upon his first transfer was unrelated to his disability.

Where we do identify clear error, however, is in the conclusion that Doe's second transfer constituted a but-for cause of Doe's ineligibility to play sports in his senior year at a League member-school in Rhode Island. Of course, it is a reasonable inference from the evidence that Doe did not "f[all] under the jurisdiction of the League and its Eight-Semester Rule" and thereby "face" his ineligibility until he transferred back into the League's jurisdiction. See id. at 113. However, his ineligibility to play sports in his rescheduled senior year at a

member-school materialized as soon as he reclassified as a freshman at the boarding school back in 2021 and thereby committed himself to completing his senior year during his fifth year of high school, regardless of where he did so.  His subsequent choice to return to a League member-school, regardless of the reason, had no bearing on that result because by then, Doe's ineligibility to play within the League during his senior year had already been cast in concrete.  In other words, the "outcome" -- Doe's ineligibility in his fifth year of high school under the League's rules -- would not "change" if the fact of his disability were removed from the sequence of events.  It is therefore not a but-for cause of his ineligibility.  See Bostock, 590 U.S. at 656.

This case is largely indistinguishable from others in which plaintiff-students have exhausted their time to play competitive sports in high school for reasons unrelated to their disabilities, foreclosing their reasonable-accommodation claims for lack of a causal link.  See, e.g., Rhodes v. Ohio High Sch. Athletic Ass'n, 939 F. Supp. 584, 592 (N.D. Ohio 1996) (finding that student's disability did not cause his repetition of freshman year upon transferring schools and therefore did not cause his ineligibility under an eight-semester rule); cf. Pritchard v. Fla. High Sch. Athletic Ass'n, 371 F. Supp. 3d 1081, 1084, 1087-88 (M.D. Fla. 2019) (finding that student, who "already completed four consecutive years" in high school athletics, did not show that his

repetition of the tenth grade upon his disability-driven transfer caused his subsequent ineligibility under four-year rule).  As in these cases, we look to whether the student's disability was the but-for cause of the student's ineligibility under the program's governing rules, not whether the disability motivated the student to seek a waiver of these rules despite unrelated grounds for ineligibility.  To hold otherwise would permit a student to circumvent non-disability-related ineligibility under a program's rules by simply citing a disability as his/her motivation to participate, even if his/her ineligibility bears no relationship to the disability.  Such a result would deprive the ADA's causation requirement of meaning.[7]

For his part, Doe argues that in the absence of a waiver, his disability prevents him from "play[ing] sports in his senior year" because, essentially, his disability prevented him from

---

[7] To reach the opposite result, Doe and the district court rely on the Seventh Circuit's decision in Washington v. Indiana High School Athletic Association, 181 F.3d 840 (7th Cir. 1999), and the District of Connecticut's decision in Dennin v. Connecticut Interscholastic Athletic Conference, Inc., 94 F.3d 96 (D. Conn. 1996).  We are unswayed by these outlier cases.  The Seventh Circuit has declined to apply the Washington rule to highly similar facts, see A.H., 881 F.3d at 594, and no other circuit has cited its causation analysis approvingly.  Similarly, while the Second Circuit dismissed the suit in Dennin as moot without reaching the merits and has not revisited its analysis of the rule at issue, see 94 F.3d 96, 100-02 (2d Cir. 1996), other district courts have found the opposite as to similar rules in the Second Circuit.  See Reaves v. Mills, 904 F. Supp. 120, 120-22 (W.D.N.Y. 1995); Marshall v. N.Y. State Pub. High Sch. Athletic Ass'n, 290 F. Supp. 3d 187, 207-13 (W.D.N.Y. 2017).

reaching his senior year at the out-of-state boarding school, where he would have played sports each year if he had remained there for four years. But this argument manipulates the terminology for academic classifications to obscure the simple semester count underlying his ineligibility. Doe's disability did not prevent him from playing sports during his fourth year at a member-school of the League. To the contrary, if Doe had remained within the League's jurisdiction upon his first transfer and done so without reclassifying, his "senior" year would have occurred in his fourth year of high school regardless of his disability, and the Rule thus would not have prevented him from playing in his "senior" year. Rather, Doe seeks to play sports for a <u>fifth</u> year under the League's jurisdiction, even though, as the district court found, his choice to reclassify and thereby delay his "senior" year to his fifth year of high school had nothing to do with his disability. The ADA does not provide the runway for gamesmanship that a contrary holding here would seem to countenance.

In sum, we identify clear error in the district court's consideration of subsequent events to Doe's first transfer in analyzing the cause of his ineligibility. Stripped of that consideration, Doe's reasonable-accommodation claim fails for his inability to establish the requisite causation under the ADA.

**B.**

Even if Doe could establish a causal link between his disability and the denial of his waiver request, his reasonable-accommodation claim fails for another reason: the accommodation he seeks, waiving the Eight-Semester Rule despite having had an opportunity to play high school sports for eight semesters, would constitute a "fundamental alteration" of the League's athletics program.

Under Titles II and III, a defendant need not grant a requested accommodation where it would "fundamentally alter the nature" of the activity.[8]  Kiman, 451 F.3d at 283 (Title II); Martin, 532 U.S. at 682 (Title III).  In Martin, the Supreme Court articulated two ways that requested modifications of the rules governing a competitive sport could amount to fundamental alterations.  532 U.S. at 682-83.  First, a requested modification

---

[8] A fundamental-alteration defense under Titles II and III is akin to, but distinct from, an undue-burden defense.  See Sosa v. Mass. Dep't of Corr., 80 F.4th 15, 32-33 (1st Cir. 2023).  Because a defendant may overcome a reasonable-accommodation claim based on either, we examine Doe's proposed accommodation through the fundamental-alteration lens applied by the district court.

This is not to say that Titles II and III are identical as to the undue-burden analysis, however.  Title II provides for a formal undue burden defense, see Toledo v. Sánchez, 454 F.3d 24, 32 (1st Cir. 2006), while Title III does not (except in limited circumstances involving the provision of "auxiliary aids and services," 42 U.S.C. § 12182(b)(2)(A)(iii)), although considerations of burdensomeness can factor into the reasonableness analysis, see Bercovitch v. Baldwin School, Inc., 133 F.3d 141, 154 (1st Cir. 1998).

that "alter[s] such an essential aspect of the game . . . that it would be unacceptable even if it affected all competitors equally" could constitute a fundamental alteration.  Id. at 682.  Second, "a less significant change that has only a peripheral impact on the game itself" but nonetheless gives the player with a disability "an advantage over others" that "fundamentally alter[s] the character of the competition" may be sufficient.  Id. at 681-82. Here, the district court concluded that the Rule is not an "essential aspect" of competition in the League.  Doe, 735 F. Supp. 3d at 114-16.  Even affording appropriate deference to this finding by the district court, see Contour Design, 693 F.3d at 112, this was error.[9]

The record compels the conclusion that the Rule is essential to competitive high school sports in Rhode Island and that Doe's requested accommodation constitutes a fundamental alteration to the League's interscholastic athletics program.  The League's mission is "to provide educational opportunities for students through interscholastic athletics."  In service of this mission, the League describes the purpose of its rules as, inter alia, to "promote even competition and maximum participation."

---

[9] The district court went on to analyze whether, as a "peripheral rule," the Rule unfairly advantages Doe or his team over others or otherwise upsets competition in the League.  Id. at 116.  Concluding that the Rule is essential to the League's activities, however, we do not reach this question.

Relatedly, counsel for the League emphasized at the district
court's motion hearing that, in addition to promoting "harmony"
between different high schools, the Rule serves the purpose of
"preventing displacement" -- that is, preventing abnormally older
students from depriving their younger peers of opportunities to
play that they would otherwise enjoy.  And indeed, the League's
articulations of the Rule's purpose correspond with the rationale
for eligibility rules promulgated by the National Federation of
State High School Associations ("NFHS"), of which the League is a
member.   In its handbook, which provides template rules and
guidance to state-level associations like the League, the NFHS
states that:

> A maximum participation requirement promotes
> harmony and fair competition among member
> schools by maintaining equality of
> eligibility.  Each student is afforded the
> same number of semesters of athletics
> eligibility, which increases the number of
> students who will have an opportunity to
> participate in interscholastic athletics.

National Federation of State High School Associations, 2023-24
NFHS Handbook 21 (2023), https://www.nfhs.org/media/7212441/2023-
24-nfhs-handbook_w-cover.pdf [https://perma.cc/F89P-VUTC].  Read
in light of this guidance, the League's Rule displays paramount
attention to its mission to "provide educational opportunities" to
the "maximum" number of students possible, since as a simple matter
of arithmetic, its constraint on any single student's eligibility

to a finite number of playing opportunities enables more students to receive those opportunities.[10]  Without the Rule, a student in a ninth or tenth semester of high school could consume the playing time otherwise available to students on the same team, as well as truncate the seasons of other teams that lack the same maturity advantage, directly undermining the League's pedagogical mission.[11]

The Sixth Circuit considered a nearly identical set of circumstances in McPherson v. Michigan High School Athletic Association, 119 F.3d 453, 461-63 (6th Cir. 1997).  There, the plaintiff sought a waiver of a similar eight-semester limitation from Michigan's analogue to the League, asserting that he should

---

[10] District courts in other circuits have identified the same core purposes in similar eight-semester rules.  See Starego v. N.J. State Interscholastic Athletic Ass'n, 970 F. Supp. 2d 303, 306 (D.N.J. 2013); Marshall, 290 F. Supp. 3d at 211.

[11] We emphasize the significance of the distinction between this "aspect" of the League's program, which performs a quasi-educational purpose, with that of the PGA Tour's golf tournaments in Martin, which do not.  See generally Martin, 532 U.S. at 682-88.  In Martin, the Supreme Court examined the requirement that players walk between holes in light of the "fundamental character of the game of golf" -- in other words, the extent to which that walking requirement interfered with "shotmaking," the "essence of the game." Id. at 683. Here, the district court incorrectly narrowed the fundamental-alteration inquiry.  In Martin, the Supreme Court focused on the rules of play for the game of golf because the proposed accommodation narrowly applied to those rules.  See 532 U.S. at 682-85.  By contrast, here, the proposed accommodation implicates the League's rules for the whole of its interscholastic athletics program and must be analyzed in light of the objectives served by that program writ large, not merely the objectives of the individual sports that it facilitates.

be permitted to play sports for his ninth and tenth semesters of
high school as a reasonable accommodation of his disability after
it caused him to repeat the eleventh grade. Id. at 455-56. The
Sixth Circuit vacated the district court's injunction in the
plaintiff's favor. Id. at 464. Drawing on its parallel prior
holding regarding age-based restrictions, the Sixth Circuit noted
that Michigan's eight-semester limitation is "necessary" because
its removal would, in part, "inject[] into competition students
older than the vast majority of other students." Id. at 462
(quoting Sandison v. Mich. High Sch. Athletic Ass'n, 64 F.3d 1026,
1035 (6th Cir. 1995)). The Sixth Circuit explained that this
distortion would raise many of the same concerns acknowledged and
dismissed by the district court here: ensuring competitive parity
by limiting "the level of athletic experience and range of skills
of the players in order to create a more even playing field" for
students, protecting students' safety by limiting their "size and
physical maturity," and avoiding "red-shirting." Compare id. at
461-62, with Doe, 735 F. Supp. 3d at 115. Perhaps most
importantly, the Sixth Circuit noted that waiving the limitation
would take from "players who observe the age-limit rule and the
eight-semester rule, presumably athletes of less maturity, a fair
opportunity to compete for playing time." McPherson, 119 F.3d at
461. Given the importance of these objectives in interscholastic
athletics, the Sixth Circuit reasoned, "[r]equiring a waiver of

the eight-semester rule . . . would work a fundamental alteration in Michigan high school sports programs." Id. at 462.

Faced with similar concerns here, we come to the same conclusion as the Sixth Circuit and believe that granting Doe a waiver of the Rule under these circumstances would fundamentally alter the League's program in light of its mission. As in McPherson, the League's eight-semester limitation is foundational to the competitive parity that maximizes student participation in high school sports in Rhode Island. See id. at 461-62. And, like in Michigan, requiring the League to grant waivers to students on the grounds present here would permit an unknown number of students, so long as they satisfy the League's age restriction, to leverage additional semesters' experience to the competitive disadvantage of other students at their school and elsewhere in the League. See id. Such a result would fundamentally undercut the League's principal goal of maximizing the educational opportunities available through interscholastic athletics to all students.

Additionally, like the Sixth Circuit, we see "no principled distinction between the nature and purpose" of this Rule and age-based limitations on eligibility, which courts have uniformly held to be an essential aspect of high school athletics programs across the country. Id. at 461 (noting how age- and grade-based restrictions work in tandem to achieve the same

result); see Sandison, 64 F.3d at 1036-37; Pottgen v. Mo. State
High Sch. Activities Ass'n, 40 F.3d 926, 930-31 (8th Cir. 1994);
Reaves v. Mills, 904 F. Supp. 120, 123 (W.D.N.Y. 1995). We view
this case as part-and-parcel with those cases.

   Finally, the essential nature of the eight-semester
limitation is further evidenced by the fact that, of the
thirty-four waivers of the Rule granted by the League in the last
ten years, not one permitted a student to play sports for more
than eight semesters. Rather, in every case, the student
requesting a waiver was prevented from playing anywhere for one or
more of their first eight semesters of high school due to
extenuating circumstances that precluded his/her attendance in
school.[12] The students that benefitted from these waivers thus did
not gain the advantage of extra semesters' athletic training that
Doe did and therefore did not implicate the same risks to the
League's objectives as Doe's requested accommodation. And while
not dispositive, the League's consistent aversion to waiving the

---

[12] The circumstances leading to these students' absences were,
in many cases, extreme. For example, one student was granted a
waiver of the Rule because they were homeless "at times" and as a
result too "sporadically enrolled" in school to participate during
any prior semester. In another case, the League permitted a
student to play beyond eight semesters because the student's
sibling was murdered during the student's sophomore year,
"resulting in severe mental issues" requiring "out-of-district
placement to cope with his loss."

Rule under circumstances like those here supports the conclusion that the Rule is essential to the League's program.

Therefore, even affording the required deference to the district court's "intensively fact-based inquiry" into whether an individualized accommodation would constitute an essential aspect of competition and therefore a fundamental alteration, <u>Martin</u>, 532 U.S. at 673 (quoting <u>Martin</u> v. <u>PGA Tour, Inc.</u>, 204 F.3d 994, 1001 (9th Cir. 2000)), we conclude that its finding in the negative here was clearly erroneous.[13]

### III.

For the reasons stated, we conclude that Doe has not established actual success on the merits of his reasonable-accommodation claim. <u>See</u> <u>Mass. Water Res. Auth.</u>, 256 F.3d at 51 n.15. We accordingly **<u>vacate</u>** the permanent injunction and **<u>remand</u>** to the district court for further proceedings consistent with this opinion. Costs to appellant.

---

[13] We emphasize that <u>Martin</u> requires an analysis of whether the accommodation actually requested, not any requested accommodation under any circumstances, would work a fundamental alteration. <u>See</u> <u>Martin</u>, 532 U.S. at 683 ("We are not persuaded that a waiver of the walking rule <u>for Martin</u> would work a fundamental alteration in either [test]." (emphasis added)); <u>see also</u> <u>A.H.</u>, 881 F.3d at 595-96 (holding that "A.H.'s accommodation requests are unreasonable" under <u>Martin</u> and that requested accommodation of "lower[ing] the qualifying times for State by creating a new division of runners would fundamentally alter the essential nature" of track-and-field meets).